[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, whose birth name was Smith, and the defendant were married on May 8, 1982 in Syracuse, New York. The parties moved to Connecticut shortly after their marriage, and had one child, issue of the marriage, Kevin, who was born on January 3, 1987. The plaintiff moved to Galveston, Texas in June of 1992, and has resided there during the pendency of this action. The parties agreed at trial that their marriage had irretrievably broken down, although the testimony was not consistent with respect to when the parties came to their respective decisions concerning that fact. The court finds that the marriage is irretrievably broken down and grants a decree dissolving the marriage.
The defendant continues to reside in Connecticut, currently with his mother in Middlebury. The minor child of the parties has remained in Connecticut, pursuant to court order, during the pendency of this action. The procedural history of this case is of minor interest. After the plaintiff brought this action, the defendant moved for an injunction, asking that the minor child remain in Connecticut, and asking that the defendant have custody of the child pendente lite. The plaintiff had brought a simultaneous motion for custody, which was denied. The court, Harrigan, J., granted joint legal custody, and ordered that Kevin's primary residence be with the defendant father. CT Page 6401 Thereafter, an attorney was appointed for the minor child, but no action was ever taken by counsel to refer the matter to Family Services pursuant to the motion filed. There was no action requested, it appears, on the motion for a psychological evaluation of the parties.
On February 17, 1994, the court, Harrigan, J., transferred the case to Litchfield for trial. Trial commenced on May 24, 1994, and concluded on June 1, 1994, with brief closing argument by counsel.
While there is one financial issue outstanding between the parties, the essence of this case has been the parties inability to forge an agreement about what is in Kevin's best interest at this moment in his life, and about where and with whom he will reside during the school year. Kevin, to his credit, has been steadfast in his refusal to take a position. He has been described in testimony as an intellectually gifted young boy with serious social immaturity. He has a strong relationship with both of his parents, and refuses to involve himself in this conflict. He is the one member of this fractured family who is very clear about what constitutes his family — his father, his mother, and himself. It is a great problem for him that they cannot make this decision for him at this time. His parents do not seem to understand that Kevin will present them with similar challenges as they proceed to assist him to adulthood.
The court believes a brief review of the marital history and circumstances will assist in helping the parties understand the important conclusions that they have asked the court to make. The plaintiff met the defendant in 1975, while working in the automotive department in the Sears store in Syracuse, New York. The plaintiff was in high school at the time, and the defendant was married with four (4) children. The defendant was thirty-six (36) at the time they met. Their relationship as co-workers developed into a romantic relationship in 1976, and the defendant was divorced in 1977. The parties maintained their relationship, and were married on the same day the plaintiff graduated from college. She has taken some CT Page 6402 Master's level courses and the defendant is an electrical engineer. The plaintiff, since her move to Galveston, has entered a nursing program, and intends to be employed as a nurse following her graduation. Both parties are highly intelligent and employable in the future. The plaintiff is in good health, but the defendant suffers from rheumatoid arthritis and stomach ulcers. Both are capable of most of life's activities, such as care of their child, and full time employment.
The plaintiff claimed that the marriage was a good one for the first two (2) years, but that it became "bumpy" thereafter, mostly because of money problems. The plaintiff testified that the defendant accused her of an affair with a co-worker, which she denied. The defendant did not claim infidelity, but rather held out hope throughout the proceeding that the marriage could be restored. The plaintiff claimed that both parties worked outside the home, and that household responsibilities were to have been shared, which did not happen. The plaintiff claimed that the majority of the household work was done by her.
The plaintiff claimed that they rarely socialized with other couples, and that the defendant pursued his interest in an adult hockey league. The plaintiff socialized with her friends occasionally. The defendant claimed in his testimony that the parties "discussed" finances, but that he never considered those conversations to be arguments. He testified that the plaintiff liked to read and that he was interested in his computer. The parties impressed the court as people who were reserved and polite with one another, but their ability to communicate their concerns to one another was poor. Their age difference may have had an impact on their expectations and ability to comprehend the spoken concerns. They seemed to have little, if any, ability to communicate on a non-verbal or emotional level.
The plaintiff testified that, at first, she was not expecting to have any children. The defendant already had four children by his first marriage. During the course of the marriage, however, she changed her mind. The defendant agreed with her decision to CT Page 6403 become pregnant, and shortly thereafter, Kevin was conceived. The plaintiff claimed that the defendant was not emotionally supportive of her during what for her was her first pregnancy. She was disappointed, and became more estranged from him during that time. She also continued to work outside and within the home. Late in the spring of 1990, the plaintiff expressed interest in securing her teaching certificate, but the defendant's unemployment meant that they were unable to afford the courses required for that credential. That, coupled with her continued dissatisfaction in the marriage, led her to separate from the defendant. The parties maintained separate homes, but essentially shared custody of Kevin, working around their work schedules. When it appeared that she could not live on her employment income in this area, she explored other options and moved to Texas where her brother and sister-in-law were living.
At the time she left, she testified she believed that the defendant had agreed to allow her to take Kevin and enroll him in school in Texas. His testimony was inconclusive, but after a meeting with their respective attorneys, it was agreed that Kevin would travel to Texas with his mother for the summer but return to Connecticut in the fall to begin school in Middlebury. That has been the situation during the pendency of this action. Kevin and his mother have spent holiday time together, and his day-to-day activities have been here with his father in the State of Connecticut. Both parents are competent parents, and need to understand that they each bring strengths to their child. Because of mother's decision to move to a geographically distant place, Kevin's time with each parent must be determined predominantly by his school schedule. The court has had to assess his other needs in determining where he should live during the school year.
The court heard testimony from the parents, Kevin's karate instructor, his classroom teacher, Mrs. Peterson, the school guidance counselor, Mrs. Kemp, his therapist, Mrs. Flynn, his aunt, Mrs. Meier, and a family friend, Mrs. Curtis. The parties also stipulated to the introduction of a telephone CT Page 6404 deposition of Dr. Cindy Wigg, a psychiatrist from Texas.
Mrs. Kemp's testimony concerning Kevin's description of himself is the essence of a child's tragedy in a custody dispute. Kevin said, ". . .a tug of war and I am the rope, and the rope is going to break." Mrs. Kemp's testimony was focusing on his most recent regressive behaviors of anxiety and nervousness, typified by nail biting, slapping himself in the face, and flinching when touched. She felt he was a child under a great deal of stress. Dr. Wigg indicated in her testimony (T., p. 42) that Kevin is so anxious that he organizes difficult things and intellectualizes them. She felt that his anxieties were more related to his social interactions than with his living situation and any change that might occur.
Mrs. Peterson, his teacher, felt that Kevin needed to focus on other child-related activities. She knew that Kevin spent many after school hours involved with the computer, and had advised both of his parents to limit that activity. The defendant produced testimony from his karate instructor, who indicated that Kevin was progressing very well, and his own testimony about Kevin's soccer, to demonstrate that Kevin's interests had indeed expanded during this school year. Mrs. Peterson felt that Kevin's skipping of kindergarten, and moving through first grade early did not help his socialization skills. Her observations of Kevin included a range in performance depending on his emotional condition on any given day, and his great upset at doing something wrong or forgetting something. She believed he was not always able to maximize his abilities because of his emotional fragility.
Mrs. Peterson and Mrs. Kemp testified that they had asked the defendant to involve Kevin in counseling with Mrs. Flynn, and that his response to that request was not timely. Mrs. Peterson indicated that each time she brought up the issue of Kevin's social immaturity, dad changed the subject, talking instead about his intellectual ability. Mrs. Peterson testified that she did not feel that dad really understood the nature of Kevin's deficits. The request to get him into CT Page 6405 counseling in the fall was not adhered to until December, after a letter was sent to dad, and copied to mom in Texas.
Upon examination by Mr. Bozzuto, Kevin's attorney, Mrs. Peterson testified that the parent to whom she was better able to communicate Kevin's whole person needs was more. She felt that Kevin always was very excited about his trips to Texas, and that any regression was due to the court process and not to any anxiety about a new school. Mrs. Peterson talked about Kevin's self-injuring behaviors in class, and that he had signed a letter, ". . .world's punching bag." The plaintiff mother cried throughout this testimony.
Mrs. Kemp's testimony was consistent with that of Mrs. Peterson. She felt that Kevin's self-esteem was weak, and that he demonstrated sensitivity when anyone raised a voice. He told her once, that when his father yelled, he was scared. His body language seemed to confirm that. Mrs. Kemp felt that Kevin had great loyalty to both of his parents, but in examination by Mr. Bozzuto, questioned father's love and caring for the child. She felt that dad had less insight into the problem of social skills, and that he did not appreciate the significance of failure in that area of Kevin's life. Dad's prioritizing of academic skills over social skills created a problem in her dealings with dad over Kevin.
Mrs. Flynn described the counseling process as seriously compromised by this court action. She felt that Kevin was receiving a message that stressed competition, and that as a result, he had an intense need to perform well. There were serious issues of acceptance and self-esteem for Kevin. She testified that in the recent sessions, Kevin "shut down" and refused to verbalize. He was feeling terrible about the court case and would not share anything with her. Mrs. Flynn felt that his need to know for sure where he would be living during the school year was critical to making any further progress in counseling. She agreed with the testimony of Dr. Wigg, who recommends, regardless of where Kevin resides, that he receive some individual therapy and group therapy with children his CT Page 6406 own age.
Both parents have demonstrated necessary skills at day-to-day parenting, arranging adequate day care, and managing Kevin's schedule with their own. Both parents are quiet and loving people to Kevin, and respectful of one another. It is very sad that mom made the adult decision to move to a distant state to find adequate employment and living conditions. Her reasons were valid, but did not take into account sufficiently, the great adjustment that Kevin would have to make.
The defendant father testified that he did not give up hope that the marriage could be reconciled until approximately six (6) weeks prior to trial. In response to questions on cross-examination, the defendant testified that he did not know if he kept Kevin to get his mother back. With tears in his eyes, he stated that while he did not think that he had, he could not say that he had not. That admission, coupled with the testimony of Kevin's teacher and guidance counselor, led the court to find that part of his motivation to contest custody in this case came from his adult desire to maintain a relationship with the plaintiff. His decision to maintain this custody issue through trial cannot be found to be based solely on Kevin's needs. The defendant called Mrs. Peterson, Kevin's teacher, and Mrs. Kemp, his guidance counselor, as his witnesses. Their testimony was not helpful to his proof, but it was essential for the court's proper resolution of this very difficult issue.
The court further was concerned that the defendant used the fact of his being the residential parent to remain under-employed. He testified that his son had offered him a position with more authority and more income, but that his work hours would interfere with the demands of Kevin's schedule. The defendant must realize that being under-employed does not teach a child to be responsible as an adult. Each parent should maximize his or her skills in the marketplace to give Kevin the security of a higher total income. It is not acceptable to compromise one's earning capacity. Clearly, it is in Kevin's best interest that his father demonstrate competitiveness in the marketplace, if he CT Page 6407 stresses that attribute to Kevin. For Kevin to educated commensurate with his ability, the parents need to earn to their highest potential to afford that education.
The plaintiff mother has testified that she moved to Texas to make a better life for herself and her son. She found the cultural diversity of Galveston to be a benefit to her son. She testified that she had family there, and the brother and sister-in-law who lived there were friendly to the defendant. She contrasted that to living near another sister who lives in the middle atlantic states, certainly closer to Connecticut, because the defendant's relationship with that sibling was not as successful. She felt that he would have less resistance to her move to Texas on that basis.
Perhaps the respect that the parties have maintained for one another, even during the court process, made it difficult for them to reach their own conclusion as to how best to raise their child in two geographic areas.
The court has assessed the evidence, and the arguments of counsel, and finds that, at this time in his life, Kevin should live during the school year with his mother in Texas, and spend summers with his dad in the State of Connecticut. The parties have demonstrated their ability to share joint legal custody of Kevin, and the court will continue that order. The parties shall see to it that Kevin stays in telephone contact with the other parent during the year. The court further orders that the parents are to arrange counseling for Kevin consistent with the recommendations of Dr. Wigg. The defendant shall pay child support consistent with the uniform support guidelines, which order shall be suspended during the summer months when Kevin resides primarily with his father. The defendant will report to counsel, who will report any change of income to plaintiff's counsel, at least twice a year. The child support is subject to modification as the defendant becomes more suitably employed. The court feels it is important to note that because he will attend school in Texas, his summer CT Page 6408 vacation, and hence his time with dad will be more extensive insofar as the testimony indicated that the school year in Texas ends much sooner than in the State of Connecticut. The parties shall share the cost of transportation for summer visitation, but the defendant will be responsible for the cost of transportation at other times. The court notes that the defendant is capable of earning much more than the plaintiff, at least for the time being.
The parties shall provide medical insurance for the minor child, and shall use the most cost effective formula in determining which available plan should be used. They shall pay equally for that insurance, as well as unreimbursed medical expenses.
The defendant shall pay Mr. Bozzuto's legal fees in conjunction with his representation of Kevin from his IRA, and he shall be responsible for any tax consequence therefrom. If the defendant can secure funds from any other source to meet the court's order, he may do so, so long as Mr, Bozzuto is paid in full forthwith.
The defendant shall transfer to the plaintiff twenty-five (25%) percent of his IRA. The parties shall retain all other property, including bank accounts, retirement accounts, and personalty, currently in their possession.
The parties shall alternate the tax exemption for Kevin, with the defendant father claiming the exemption in 1994.
The parties shall each be responsible for the debts listed on their respective financial affidavits, and hold the other harmless therefrom.
The parties shall each be responsible for their own attorney's fees.
Judgment shall enter consistent with this opinion.
DRANGINIS, J.
CT Page 6409